UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DAVID GULDSETH, MD, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 17-cv-12112-ADB |
| FAMILY MEDICINE ASSOCIATES LLC and GREGORY BAZYLEWICZ, MD, | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE

BURROUGHS, D.J.

Plaintiff David Guldseth, MD ("Dr. Guldseth") brings this action against Defendants

Family Medicine Associates LLC ("FMA") and Gregory Bazylewicz, MD ("Dr. Bazylewicz,"

and, together with FMA, "Defendants"), alleging various claims arising from his former

employment with FMA.  See [ECF No. 1 ("Compl.")].  Currently before the Court are

Defendants' motion for summary judgment, [ECF No. 54], and Dr. Guldseth's motion to strike

certain aspects of the summary judgment record, [ECF No. 61].  For the reasons set forth below,

Defendants' motion is GRANTED and Dr. Guldseth's motion is DENIED as moot.

## I.    BACKGROUND

### A.    Factual Background

Except as otherwise noted, the following facts are undisputed.[1]

---

[1] The Court draws the facts from Dr. Guldseth's Response to Defendants' Statement of
Undisputed Material Facts, [ECF No. 59-1], which contains both parties' contentions regarding

Dr. Guldseth is a licensed physician.  [ECF No. 59-1 ¶ 1].  FMA is a Massachusetts limited liability company that provides medical services.  [Id. ¶ 2; ECF No. 60-1 at 3]. Dr. Bazylewicz was a practicing physician and, until his retirement, one of FMA's partners.[2] [ECF No. 59-1 ¶ 3].

In 2012, Dr. Guldseth contacted a New England recruiter because he was interested in potentially working in the region.  [ECF No. 59-1 ¶ 4].  The recruiter identified FMA—which has offices in Hamilton, Manchester, and Middleton, Massachusetts—to Dr. Guldseth as a possible landing spot.  [Id. ¶ 5; ECF No. 56-2 (FMA letterhead listing locations)].  On April 21, 2012, Dr. Bazylewicz emailed Dr. Guldseth, writing that FMA was "looking for an additional [family practitioner] this year, mainly to assume [Dr. Bazylewicz's] practice over time."  [ECF No. 60-2 at 2].  On May 5, 2012, Dr. Bazylewicz again emailed Dr. Guldseth, providing additional information about FMA's operation and profitability and expressing "interest[] in attracting a younger [family practitioner] to take over [Dr. Bazylewicz's] full, busy practice." [ECF No. 60-3 at 2].  Dr. Bazylewicz added that he was offering Dr. Guldseth "a tremendous opportunity to eventually be a partner in the group, flourishing in private practice of Family Medicine."  [Id.].  At some point between May 9 and May 16, 2012, Drs. Bazylewicz and Guldseth spoke over the phone.  See [id. (May 9, 2012 email indicating that they had not yet spoken); ECF No. 60-4 at 2 (May 16, 2012 email indicating that they had)].  According to Dr. Guldseth, during this conversation, which was not recorded, transcribed, or summarized in

---

the facts set forth in support of Defendants' motion for summary judgment, Dr. Guldseth's Statement of Material Facts in Dispute, [ECF No. 59], and the documents referenced therein.

[2] Although, pursuant to the terms of FMA's operating agreement, FMA's owners are actually called "members" as opposed to "partners," the Court will use "partner" because the parties generally use "partner," both in this litigation and during the time period relevant to the dispute.

writing by Dr. Guldseth, [ECF No. 56-1 at 5], Dr. Bazylewicz promised that if Dr. Guldseth

joined FMA, after eighteen months, he would take over Dr. Bazylewicz's practice and his FMA

partnership interest.  [ECF No. 59 ¶¶ 1–8].  During this same call, Dr. Bazylewicz also said that

his compensation consisted of income from his team of nurse practitioners, rental income from

the office building, income generated from a lab that FMA owned, and personal practice income.

[ECF No. 56-1 at 42–43].

In late May or early June 2012, Dr. Guldseth and his family visited FMA.  [ECF No. 59-1

¶ 7]; see [ECF No. 60-5 at 2 (email from Dr. Bazylewicz to Dr. Guldseth describing visit)].  In

an email following up on the visit, Dr. Bazylewicz reiterated his interest in having Dr. Guldseth

take over his practice.  [ECF No. 60-5 at 2].  On or around July 12, 2012, FMA sent Dr. Guldseth

a written Offer of Employment (the "Offer").  [ECF No. 59-1 ¶ 8].  The Offer laid out terms of

Dr. Guldseth's potential employment but did not reference the fact that Dr. Guldseth would

acquire Dr. Bazylewicz's partnership interest in FMA after eighteen months.  [Id. ¶ 9].

Dr. Guldseth reviewed the Offer, signed it on July 23, 2012, and returned it to FMA.  [Id. ¶ 10].

FMA then sent Dr. Guldseth a draft employment agreement, consistent with, but more detailed

than, the Offer.  [Id. ¶ 11].  Although Dr. Guldseth opted not to have an attorney review it, [ECF

No. 56-1 at 52], he reviewed it himself, and emailed with FMA's administrator, Elizabeth Hill,

about changes he wanted to make to the employment agreement before signing it, see [ECF No.

56-2 at 25 (Sept. 18, 2012 email from Dr. Guldseth to Ms. Hill discussing questions and

proposed amendments); ECF No. 60-13 at 3 (Sept. 20, 2012 email from Dr. Guldseth to Ms. Hill

discussing the wording of a particular provision)].  Some of his proposed changes were accepted

and others were not.  See [ECF No. 56-1 at 54–55].

At some point in late September or early October 2012, Dr. Guldseth and FMA executed the employment agreement (the "Employment Agreement"). [ECF No. 56-2 at 11–24]. It would become effective five days after Dr. Guldseth obtained his Massachusetts medical license and last for two years, unless terminated sooner.[3] [Id. at 11]. Pursuant to the Employment Agreement's compensation provision, Dr. Guldseth was to be compensated as follows:

> For the initial six (6) months of employment . . . [Dr. Guldseth] shall be paid a salary at an annualized rate of $260,000.00 payable biweekly in equal payments of Ten Thousand Dollars ($10,000.00) net of all withholding requirements.

> For a period of one (1) year immediately following [Dr. Guldseth's] initial six (6) months of employment, [he] shall be paid sixty percent (60%) of [his] team Annualized Net MD Income collected by FMA that is attributable to professional services rendered by [Dr. Guldseth], a nurse practitioner, a physician's assistant or any other member of [his] team (the "Team"). Annualized Net MD Income is defined as all income received from services rendered by the Team, less all direct and indirect overhead and other expenses attributable to the Team, consistent with prior years. In addition, all payroll taxes and other employment related expenses of [Dr. Guldseth] will be deducted prior to calculating Annualized Net MD Income. [Dr. Guldseth] agrees that the Annualized Net MD Income shall be calculated by FMA's outside public accounting firm, and shall be binding on [him].

> Following [Dr. Guldseth]'s initial eighteen (18) months of employment, [he] shall be paid one hundred percent (100%) of the Team's Annualized Net MD Income collected by FMA that is attributable to professional services rendered by the Team.

[Id. at 12]. In addition to the compensation described above, Dr. Guldseth received a $30,000 signing bonus, paid partially upon his execution of the Offer and partially upon his execution of the Employment Agreement. See [id.]. Dr. Guldseth "agree[d] to accept the compensation [as described in the Employment Agreement] as full compensation for service rendered pursuant to th[e] Employment Agreement . . . ." [Id. at 13]. The Employment Agreement's integration clause provides that the agreement "sets forth the parties' entire understanding concerning the

---

[3] Either party could terminate upon ninety days' written notice for any reason. [ECF No. 56-2 at 15].

subject matter hereof and supersedes any and all prior agreements, understandings and representations, whether oral or written." [Id. at 21]. The Employment Agreement does not mention Dr. Bazylewicz's partnership interest in FMA, Dr. Guldseth obtaining that interest, or any income from a building or lab, [ECF No. 59-1 ¶ 16], though Dr. Guldseth maintains that the Employment Agreement's reference to his earning 100% of his team's Annualized Net MD Income after eighteen months "represent[ed] the transfer of Dr. Bazylewicz's practice and partnership to him," [id. ¶ 17].

Dr. Guldseth began working at FMA in October 2012. [ECF No. 59-1 ¶ 19]. Dr. Bazylewicz practiced at FMA until August 2013. [Id. ¶ 20]. On or about May 12, 2014, Dr. Guldseth contacted Ms. Hill to inquire as to when he would obtain Dr. Bazylewicz's partnership interest. [Id. ¶ 22]. The same day, an FMA partner, Dr. Steven Barrett, who had apparently been forwarded Dr. Guldseth's message to Ms. Hill, responded, disputing Dr. Guldseth's characterization of the situation and stating that Dr. Guldseth had never been promised a partnership interest in FMA. [ECF No. 56-2 at 27]. On or around June 16, 2014, FMA sent Dr. Guldseth a letter terminating his Employment Agreement effective October 28, 2014. [ECF No. 59-1 ¶ 25]. Shortly thereafter, Dr. Guldseth gave a presentation to the FMA partners outlining his understanding of the agreement he had reached with Dr. Bazylewicz concerning the transfer of Dr. Bazylewicz's practice and partnership interest to him. [Id. ¶ 26]. During the presentation, he acknowledged that, to his knowledge, no FMA partners, other than ex-partner Dr. Bazylewicz, had previously known about that agreement. [Id.].

Dr. Guldseth left FMA on October 28, 2014. [ECF No. 59-1 ¶ 27]. About a week earlier, he had received a letter from Ms. Hill informing him that he would receive his last paycheck on October 28, 2014 and that his accounts receivable ("A/R") for services performed

by his team through October 28, 2014 would be calculated and paid to him, less a collection fee, within ninety days.  [ECF No. 56-2 at 34].  Dr. Guldseth maintains that he was not paid all A/R that were due to him within ninety days.  [ECF No. 59 ¶ 14].  Additionally, he asserts that during months seven through eighteen of his employment, he did not actually receive 60% of his team's Annualized Net MD Income as he should have under the Employment Agreement.  [ECF No. 59 ¶ 13].

### B.      Procedural Background

On October 27, 2017, Dr. Guldseth filed suit against Defendants bringing claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), fraud (Count III), unjust enrichment/quantum meruit (Count IV), promissory estoppel (Count V), and non-payment of wages in violation of Massachusetts General Laws Chapter 149, § 148 (Count VI), and also seeking an accounting (Count VII).  [Compl. ¶¶ 47–77].  Defendants moved for summary judgment on June 15, 2020.  [ECF No. 54].  On July 15, 2020, Dr. Guldseth opposed Defendants' motion, [ECF No. 58], and moved to strike a portion of an affidavit that Defendants had filed in support of their summary judgment motion, [ECF No. 61].  On August 28, 2020, Defendants filed a reply regarding their summary judgment motion, [ECF No. 67], and opposed Dr. Guldseth's motion to strike, [ECF No. 69].  On September 11, 2020, Dr. Guldseth filed a reply in further support of his motion to strike.  [ECF No. 70].

## II.   LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in

original) (quoting <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 6 (1st Cir. 2003).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." <u>Id.</u>  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case."  <u>United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I.</u>, 960 F.2d 200, 204 (1st Cir. 1992) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" <u>Ocasio-Hernández v. Fortuño-Burset</u>, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." <u>ATC Realty, LLC v. Town of Kingston, N.H.</u>, 303 F.3d 91, 94 (1st Cir. 2002) (quoting <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 842 (1st Cir. 1993)).  That is, the nonmoving party must set forth specific, material evidence showing that there is a genuine disagreement as to some material fact.  <u>Plat 20, Lot 17, Great Harbor Neck</u>, 960 F.2d at 204 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's

favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the

nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48

(1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and

material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the

Court may discount "conclusory allegations, improbable inferences, and unsupported

speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.,

896 F.2d 5, 8 (1st Cir. 1990)).

## III.   DISCUSSION

### A.   Count VII: Accounting

Dr. Guldseth does not oppose Defendants' summary judgment motion as to Count VII

(accounting).  [ECF No. 58 at 1 n.2].  Accordingly, Defendants' motion, [ECF 54], is granted as

to Count VII.  The Court addresses the remaining counts below.

### B.   Count I: Breach of Contract

In his complaint, Dr. Guldseth premises his breach of contract claim on the alleged

breach of three separate contracts.  [Compl. ¶¶ 48–51].  First, that he and Dr. Bazylewicz entered

into a contract whereby Dr. Bazylewicz agreed to transfer Dr. Guldseth his partnership interest if

Dr. Guldseth worked at FMA for eighteen months (the "Partnership Transfer Agreement"), [id.

¶ 13], which was breached when Dr. Guldseth did not receive Dr. Bazylewicz's partnership

interest after eighteen months, [id. ¶ 50].  Second, that Defendants breached the Employment

Agreement by failing to pay Dr. Guldseth 60% of his team's Annualized Net MD Income during

months seven through eighteen of his employment.  [Id. ¶ 49].  Third, that FMA agreed to pay

Dr. Guldseth his A/R within ninety days of his departure (the "A/R Agreement") but then did not

do so, [Id. ¶¶ 40–41].  "To establish a prima facie case of breach of contract, a plaintiff must

show 1) there is a contract, 2) he performed his duties under the contract, 3) the defendant breached the contract, and 4) the plaintiff suffered damages as a result of the defendant's breach." O'Rourke v. Hampshire Council of Gov'ts, 121 F. Supp. 3d 264, 274 (D. Mass. 2015).

1.    Partnership Transfer Agreement

It is undisputed that Dr. Guldseth did not enter into any written contract with Dr. Bazylewicz specifically governing the transfer of Dr. Bazylewicz's partnership interest. [ECF No. 59-1 ¶ 17].  There is, however, evidence in the record, including Dr. Guldseth's deposition testimony and contemporaneous emails referencing the prospect of partnership, see, e.g., [ECF No. 56-1 at 42–44 (deposition); ECF No. 60-3 at 2 (email)], from which a factfinder could find that Drs. Guldseth and Bazylewicz formed an oral contract.  Nonetheless, insofar as Dr. Guldseth's breach of contract claim is premised on the alleged breach of this oral contract, his claim cannot survive summary judgment because of the Employment Agreement's integration clause.

The Employment Agreement's integration clause provides that the Employment Agreement "sets forth the parties' entire understanding concerning the subject matter hereof and supersedes any and all prior agreements, understandings and representations, whether oral or written."  [ECF No. 56-2 at 21].  Because the purported Partnership Transfer Agreement provided for the transfer of Dr. Bazylewicz's partnership interest to Dr. Guldseth if he worked at FMA for eighteen months, the Partnership Transfer Agreement and the Employment Agreement concerned the same subject matter: Dr. Guldseth's employment at FMA.  Accordingly, the Partnership Transfer Agreement, assuming it existed, was "supercede[d]" by the Employment Agreement because it was a "prior agreement[]" "concerning the subject matter" of the Employment Agreement.  [Id.].  Although an integration clause is not dispositive, "[g]enerally,

contracting parties are understood to have included an integration clause in their written

agreement with the intent 'to preclude the subsequent introduction of evidence of preliminary

negotiations or side agreements.'"  Realty Fin. Holdings, LLC v. KS Shiraz Manager, LLC, 18

N.E.3d 350, 355 (Mass. App. Ct. 2014) (quoting Chambers v. Gold Medal Bakery, Inc., 982

N.E.2d 1190, 1198 (Mass. App. Ct. 2013)).  Given how carefully Dr. Guldseth reviewed the

Employment Agreement and the fact that he is a sophisticated individual with a medical degree,

the Court will not disregard the "well-established rule of contract law that when a subsequent

written contract contains an integration clause, any preexisting oral agreements are superseded."

Butler v. Moore, No. 10-cv-10207, 2015 WL 1409676, at *92 (D. Mass. Mar. 26, 2015); see also

Realty Fin. Holdings, 18 N.E.3d at 356 (noting that where sophisticated individuals have

negotiated and executed a complex document governing a transaction, which contains an

integration clause, courts need not look to prior negotiations to divine the intention of the

parties)[4]; Bendetson v. Coolidge, 390 N.E.2d 1124, 1127 (Mass. App. Ct. 1979) ("Where the

writing shows on its face that it is the entire agreement of the parties and 'comprises all that is

necessary to constitute a contract, it is presumed that they have placed the terms of their bargain

in this form to prevent misunderstanding and dispute, intending it to be a complete and final

statement of the whole transaction.'" (quoting Glackin v. Bennett, 115 N.E. 490, 491 (Mass.

1917))).  This conclusion is not undercut by the fact that Dr. Guldseth chose not to consult with

an attorney during the contract negotiations because he evidenced a capacity to review the

---

[4] As discussed further below, the fact that the parties in Realty Finance were represented by
counsel and Dr. Guldseth was not is immaterial given Dr. Guldseth's demonstrated ability to
carefully review the Employment Agreement.

contract cautiously and with an eye towards protecting his interests.[5]  Before executing the

Employment Agreement, he was clearly willing and able to ask for clarification or amendments

on other points and easily could have done so with respect to either integration or partnership.

Thus, Dr. Guldseth's breach of contract claim based on the Partnership Transfer

Agreement fails.

### 2.   Employment Agreement

Dr. Guldseth's breach of contract claim based on the Employment Agreement fails

because he has not demonstrated any breach.  See Celotex, 477 U.S. at 322 (noting that summary

judgment is appropriate where party has failed to adduce evidence of an essential element of his

claim); O'Rourke, 121 F. Supp. 3d at 274 (stating that breach is an essential element of a breach

of contract claim).  In his Statement of Disputed Facts, Dr. Guldseth states that he was "not

correctly compensated with 60% of his team's Annualized Net MD Income," citing to his

deposition testimony and the complaint.  [ECF No. 59 ¶ 13].  First, allegations in a complaint

may get a litigant past the motion to dismiss stage, but are insufficient to defeat summary

judgment.  Carroll v. Xerox Corp., 294 F.3d 231, 236–37 (1st Cir. 2002) ("'[N]either conclusory

allegations [nor] improbable inferences' are sufficient to defeat summary judgment.  Rather, to

withstand a properly supported motion for summary judgment, the opposing party must present

'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims."

(alterations in original) (first quoting J. Geils Band Employee Benefit Plan v. Smith Barney

Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996); then quoting Goldman v. First Nat'l Bank of

Bos., 985 F.2d 1113, 1116 (1st Cir. 1993))); see Oliver v. Digital Equip. Corp., 846 F.2d 103,

---

[5] At his deposition, Dr. Guldseth testified that he did not consult a lawyer because he "trusted
Bazylewicz and his work."  [ECF No. 56-1 at 9].

109 (1st Cir. 1988) (noting that "unsubstantiated allegations" are insufficient to survive summary judgment).

Second, Dr. Guldseth's deposition testimony is largely conclusory and conjectural, [ECF No. 56-1 at 13 ("A. Yeah, that was not – clearly not paid.  And that's the point of this case – one of the points of this case is that they did not pay that correctly."); id. ("A. Well, Elizabeth Hill was backing out monies from the team and, kind of, check, seeing if I was, kind of, in agreement with backing out things, and – and I was told that they also back-dated some reports at the hospital, other unethical – you know, and other unethical things . . . .")], and therefore lacks the specificity and evidentiary weight necessary to create a genuine issue of material fact, see Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 32 (1st Cir. 2016) (finding that "vague and conclusory testimony" could not withstand summary judgment); Carroll, 294 F.3d at 237 (noting that evidence that is "'merely colorable or is not significantly probative' cannot deter summary judgment" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986))).

The closest he came to articulating an argument in support of his claim that he was underpaid is the following question and answer:

> Q. And how do you know you didn't get paid correctly?
> A. Because Bazylewicz and I had discussed that when the 60 percent would kick in my salary would go up, and that was based off of his numbers – of his 2011 numbers, and my numbers were actually better than his.  I asked the office many times, Am I seeing as many patients as Bazylewicz, and how is our revenue and all that?  And it was doing better than his 2011.  And based on his 2011 numbers, my salary would have gone up as well.

[ECF No. 56-1 at 13].  Even this is little more than "unsupported speculation" and "improbable inference."  Cochran, 328 F.3d at 6.  As a factual matter, even if he was generating more revenue than Dr. Bazylewicz, his pay was based on net income not revenue, [ECF No. 56-2 at 12], and he

has adduced no evidence regarding expenses.[6]  Further, Dr. Guldseth had months to engage in

discovery, including to request documents and/or depose witnesses to support his claim.[7]  Under

the summary judgment standard, a claim cannot survive absent competent evidence to support it.

Here, Dr. Guldseth's claim may not go forward based solely on his say-so, which is the only

evidence he has identified to the Court.  "The summary judgment stage is 'the put up or shut up

moment in litigation,'" Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 226 (1st Cir.

2013) (quoting Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010)), and

Dr. Guldseth has failed to put up.  Accordingly, his breach of contract claim premised on a

breach of the Employment Agreement fails.

---

[6] In his brief opposing summary judgment, Dr. Guldseth seems to argue that part of the reason he was underpaid was because lab and rental income were not included in the calculation of his income.  [ECF No. 58 at 8–9].  The Employment Agreement, however, defines "Annualized NET MD Income" as "all income received from services rendered by the Team, less all direct and indirect overhead and other expenses attributable to the Team."  [ECF No. 56-2 at 12].  Accordingly, under the plain terms of the contract, Dr. Guldseth was not entitled to lab or rental income.

[7] At this point in the litigation, Dr. Guldseth's argument that he requested, but did not receive, such documents, [ECF No. 58 at 14], cannot carry the day.  Based on the record before the Court, it appears that (1) Dr. Guldseth served overbroad discovery requests, see [ECF No. 71-2 at 6 (requesting "[a]ny and all documents concerning other income generating activities by you from January 1, 2010 to the present . . ."], (2) Defendants reasonably objected, see [id. (objecting on multiple grounds)], and then (3) Dr. Guldseth took no further action.  If Dr. Guldseth was dissatisfied with Defendants' objections, he should have narrowed his request, met and conferred with Defendants in an effort to resolve their objections and, if those efforts failed, filed a motion to compel.  He cannot, however, survive a summary judgment motion on the strength of hypothetical evidence that he contends he should have received during discovery.  The Court also notes that Dr. Guldseth himself seemingly did not produce a single document until his deposition, [ECF No. 56-1 at 78 ("Q. Okay.  But my question to you is a simple one: Up until today, would it be fair to say you haven't provided us with any documents in response to those requests?  A. It's probably true.")], or respond in writing to Defendants' requests for production as he was required to do under the Federal Rules of Civil Procedure, [id. ("Q. And would it be fair to say that you have never provided us with written – written responses to these requests one by one?  A. I have responded to your other one that you sent out one by one.  Q. Correct, the interrogatories.")].

###### 3.     A/R Agreement

Dr. Guldseth's breach of contract claim based on the A/R Agreement fails for multiple reasons.  First, according to Dr. Guldseth, the A/R Agreement is reflected in the October 20, 2014 letter from FMA to Dr. Guldseth, signed by Ms. Hill.  [Compl. ¶¶ 40–41].  That letter, however, is not a contract; it is merely a document outlining the departure process.  [ECF No. 56-2 at 34].  Dr. Guldseth did not sign it and it does not appear to reflect any manifestation of mutual asset.  See generally Sea Breeze Estates, LLC v. Jarema, 113 N.E.3d 355, 360–61 (Mass. App. Ct. 2018) (discussing contract formation).  Second, even if it were a contract, Dr. Guldseth has failed to adduce any evidence that FMA breached it.  In his Statement of Material Facts in Dispute, Dr. Guldseth states that "[w]ithin 90 days of his termination [he] was not paid all accounts receivable due to him for services rendered prior to October 28, 2014," citing as evidence the letter itself, allegations in his complaint, and his deposition testimony.  [ECF No. 59 ¶ 14].  The letter demonstrates nothing regarding whether the A/R were paid and, as discussed above, allegations in a complaint are insufficient to create a genuine factual dispute.  With regard to the deposition testimony, as Dr. Guldseth conceded at his deposition, the only evidence he can offer is unsupported speculation, [ECF No. 56-1 at 76 ("Q. Well, do you have any actual knowledge that you were not paid in full for all hours worked to date? A.  I do not have knowledge of that.")], and ambiguous testimony, [id. at 75 ("Q. Is there anything in that letter that you think is inaccurate, or that you disagree with? . . . A. I never recall receiving [the A/R]."].  Accordingly, Dr. Guldseth's claim premised on a breach of the A/R Agreement fails. See Celotex, 477 U.S. at 322 (noting that summary judgment is appropriate where party has failed to adduce evidence of an essential element of his claim); O'Rourke, 121 F. Supp. 3d at 274

(stating that the existence of a contract and breach are essential elements of a breach of contract claim).

### C.    Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

According to the complaint, Defendants' "knowing and direct violations of the [three alleged contracts discussed above] constitute violations of the covenant of good faith and fair dealing that is implicit in those Agreements."  [Compl. ¶ 55].  Under Massachusetts law, every contract carries with it an implied covenant of good faith and fair dealing.  Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991).  It is well-settled, however, that without a contract, there is no implied covenant.  Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005) ("[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached.").  Accordingly, where the Court has already concluded that the Partnership Transfer Agreement, if it existed, was superseded by the Employment Agreement, and that the A/R Agreement was not a contract, to the extent Dr. Guldseth's breach of the implied covenant claim is based on those agreements, it fails.

With regard to the implied covenant running with the Employment Agreement, the Court finds that Dr. Guldseth's claim also fails as matter of law.  The Supreme Judicial Court of Massachusetts ("SJC") has described the implied covenant in the following way:

> [t]he purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, and that, when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract.  A breach occurs when one party violates the reasonable expectations of the other.  However, [t]he scope of the covenant is only as broad as the contract that governs the particular relationship.  The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract.

Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1264 (Mass. 2007) (alterations in original) (citations and internal quotation marks omitted).  Insofar as Dr. Guldseth argues that Defendants breached the implied covenant by failing to transfer Dr. Bazylewicz's partnership interest to him, that was not a "fruit[]" of the Employment Agreement and, given the plain language of the contract, Dr. Guldseth could not reasonably have expected it.  As the SJC noted in Eigerman, the implied covenant does not "supply terms that the parties were free to negotiate, but did not."  Id. The transfer of Dr. Bazylewicz's partnership interest is such a term.  Additionally, to the extent that Dr. Guldseth maintains that Defendants breached the implied covenant by failing to properly calculate and pay him the 60% of his team's Annualized Net MD Income due him under the Employment Agreement, the Court has already concluded that Dr. Guldseth has not met his burden of adducing evidence sufficient to create a genuine factual dispute.  See supra, Section III.B.2.  Accordingly, Dr. Guldseth's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

**D.    Count III: Fraud**

"The elements of fraud consist of '[1] a false representation [2] of a matter of material fact [3] with knowledge of its falsity [4] for the purpose of inducing [action] thereon, and [5] that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage.'" Balles v. Babcock Power Inc., 70 N.E.3d 905, 913 (Mass. 2017) (alterations in original) (quoting Danca v. Taunton Sav. Bank, 429 N.E.2d 1129, 1133 (Mass. 1982)).  In his complaint, Dr. Guldseth premises his fraud claim on (1) various statements made by Dr. Bazylewicz or Ms. Hill, that pre-date the Employment Agreement, regarding the transfer of Dr. Bazylewicz's partnership interest to Dr. Guldseth, [Compl. ¶¶ 13–16, 19–21, 23]; (2) FMA's statement that his A/R would be paid within ninety days of his termination, [id. ¶ 40]; and (3) a statement that

FMA allegedly made to the Massachusetts Department of Unemployment Assistance ("MDUA") regarding the circumstances under which Dr. Guldseth left FMA, [id. ¶ 44]; see [id. ¶ 58 (noting bases for fraud claim)].

### 1. Statements Regarding Transfer of Partnership Interest

With respect to the first category of allegedly fraudulent statements, Dr. Guldseth's claim fails as a matter of law because of the Employment Agreement's integration clause. "An integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation." Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995) (citing Bates v. Southgate, 31 N.E.2d 551, 558 (Mass. 1941)). "Nevertheless, if 'the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." Id. (quoting Turner v. Johnson & Johnson, 809 F.2d 90, 97 (1st Cir. 1986)); see Piantes v. Pepperidge Farm, Inc., 875 F. Supp. 929, 933–34 (D. Mass. 1995) ("When one party to a contract makes nearly contemporaneous conflicting oral and written representations, it is unreasonable as a matter of law for the other party to rely upon either statement.").

First, the undisputed facts demonstrate that the Employment Agreement was fully negotiated and voluntarily signed. Dr. Guldseth received a draft, reviewed it carefully, and provided detailed comments and proposed amendments, some of which were incorporated into the executed version. [ECF No. 56-2 at 25; ECF No. 60-13 at 3]. For instance, when he was concerned that he could not make one of the representations and warranties called for in the draft agreement, see [ECF No. 56-2 at 18–21 (outlining representations and warranties)], he sent Ms. Hill a thorough email regarding a specific factual scenario, asking if he would be able to

make the representation at issue and adding that he "want[ed] to make sure [he] d[id] everything right to be in compliance with the contract," [id. at 25–26]. Additionally, in the same email, he proposed a nuanced change to the provision governing the remittance of fees collected from patients to clarify that he could moonlight (i.e., work a secondary job during his off-hours) and keep the fees that he earned when doing so. [Id.]. Given his careful and deliberate review of the draft agreement, it is immaterial that Dr. Guldseth did not engage an attorney to review it on his behalf.[8]  See [ECF No. 56-1 at 52].

Second, the purported prior oral assertions at issue here, that Dr. Guldseth would receive Dr. Bazylewicz's partnership interest after eighteen months, are squarely at odds with the Employment Agreement's compensation provision, which specifically and comprehensively addresses compensation and makes no mention of partnership. Under the clear terms of the Employment Agreement, Dr. Guldseth was to receive (1) $10,000 every two weeks for his first six months, (2) 60% of his team's Annualized Net MD Income for his next twelve months, and (3) 100% of his team's Annualized Net MD Income thereafter.[9]  [ECF No. 56-2 at 12]. Further,

---

[8] Dr. Guldseth cannot elect to forgo legal counsel and then subsequently seek to use the absence of counsel to avoid being bound by contract terms that he voluntarily negotiated and accepted.

[9] The Court acknowledges Dr. Guldseth's argument that the "Employment Agreement's reference to [Dr. Guldseth's] earning 100% of his team's Annualized Net MD Income after 18 months represented the transfer of Dr. Bazylewicz's practice and partnership to him," [ECF No. 59-1 ¶ 17], but finds it unpersuasive given that the Employment Agreement makes no reference whatsoever to the transfer of any partnership interest. Further, the Court rejects Dr. Guldseth's argument that the Employment Agreement is ambiguous because it provides for Dr. Guldseth to receive only 60% of his team's Annualized Net MD Income for months seven through eighteen and does not mention what would happen to the remaining 40%. [ECF No. 58 at 13–14]. "Ambiguity . . . is not created just because the parties disagree about the contract's meaning," Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013), and there is nothing ambiguous about the Employment Agreement. Further, when a contract's language is unambiguous the meaning of such language is a question of law to be decided by the Court. Dasey v. Anderson, 304 F.3d 148, 158 (1st Cir. 2002).

the agreement's terms clearly and unambiguously indicate that Dr. Guldseth "agrees to accept the compensation as full compensation for services rendered pursuant to th[e] Employment Agreement . . . ." [Id. at 13].

Finally, the fact that the Employment Agreement had a two-year term, [ECF No. 56-2 at 11], and a termination provision giving either party the right to terminate, without cause, upon ninety days' written notice, [id. at 15], is incompatible with the notion that Dr. Guldseth would be acquiring partnership rights after eighteen months.[10]

Accordingly, the Court finds that Dr. Guldseth's fraud claims which are premised on alleged statements regarding the transfer of Dr. Bazylewicz's partnership interest after eighteen months are inconsistent with the terms of the Employment Agreement and barred by the Agreement's integration clause.  See McCartin v. Westlake, 630 N.E.2d 283, 289 (Mass. App. Ct. 1994) ("The deliberate, uncoerced, and businesslike process by which the parties reached final, written agreements cannot be undone merely on the claim, later asserted, that the plaintiffs understood that the commitment and obligations of the parties were otherwise than as stated in the signed contract documents.").[11]

---

[10] Dr. Guldseth highlights the fact that he was not shown FMA's operating agreement, [ECF No. 58 at 7], but this, if anything, suggests that he was *not* being promised any interest in the partnership.  A reasonable person expecting to acquire an interest in a partnership would also expect an opportunity to review the partnership agreement and view the fact that he had not been shown the partnership agreement as a red flag.

[11] Dr. Guldseth's reliance on Sax v. DiPrete, see [ECF No. 58 at 16–17], is misplaced because in that case, which was decided on a motion for judgment on the pleadings, the employment agreement specifically contemplated partnership at a specific buy-in price and the plaintiff alleged that defendant made extracontractual representations regarding the buy-in, which were not flatly contradicted by the agreement.  639 F. Supp. 2d 165, 173–74 (D. Mass. 2009).  Here, any extracontractual representations that Dr. Guldseth would receive a partnership interest were contradicted by the Employment Agreement, which comprehensively addresses compensation without referencing partnership at all.

2.      Other Allegedly Fraudulent Statements

With respect to the remaining statements, to prevail on his claim, Dr. Guldseth must demonstrate that he relied upon each allegedly fraudulent statement to his detriment.  Balles, 70 N.E.3d at 913.  Here, there is no record evidence indicating that Dr. Guldseth relied upon either FMA's statement that he would receive A/R within ninety days or FMA's statement to MDUA regarding the circumstances of his departure.[12]  Accordingly, his fraud claim cannot withstand summary judgment.  See Celotex, 477 U.S. at 322 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

E.      Count IV: Unjust Enrichment/Quantum Meruit

In his complaint, Dr. Guldseth alleges that FMA was unjustly enriched because he got less compensation than he otherwise would have over the course of his employment based on his expectation that he would receive Dr. Bazylewicz's partnership interest after eighteen months. [Compl. ¶¶ 62–67].  In other words, he claims that FMA obtained his services at a discount because Dr. Guldseth believed he would make up for it on the back-end when he became a partner.  First, a "plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties."  Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office of Health and Human Servs., 974 N.E.2d 1114, 1132 (Mass. 2012).  Here, the

---

[12] As to the statement to MDUA, it is difficult to credit the idea that Dr. Guldseth relied on a statement that was made to a third party.

Employment Agreement defined FMA and Dr. Guldseth's respective obligations to each other, which forecloses a quantum meruit claim.

Second, with regard to unjust enrichment, a "plaintiff asserting a claim for unjust enrichment must establish not only that the defendant received a benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable expectations of the parties.'"  Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013) (quoting Glob. Investors Agent Corp. v. Nat'l Fire Ins. Co., 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)).  Here, based on the undisputed record evidence, no reasonable factfinder could conclude that FMA received an unjust benefit because no reasonable factfinder could conclude that Dr. Guldseth reasonably expected to receive Dr. Bazylewicz's partnership interest.  As noted above, the Employment Agreement's language is clear and unambiguous and comprehensively addresses compensation, without mention of a transfer of any partnership interest.  Moreover, it is beyond dispute that Dr. Guldseth carefully reviewed it before signing.  Under these circumstances, the Court finds as a matter of law that any benefit to FMA was not unjust.  Accordingly, Dr. Guldseth's claim for quantum meruit and/or unjust enrichment fails.  See Celotex, 477 U.S. at 322 (noting that summary judgment is appropriate where party has failed to adduce evidence of an essential element of his claim).

### F.    Count V: Promissory Estoppel

The complaint does not make clear which promises, precisely, Dr. Guldseth bases his promissory estoppel claim on but in his briefing on the instant motions, he focuses on Dr. Bazylewicz's alleged promise to transfer his partnership interest to him.  See [ECF No. 58 at 18–20].  "An essential element under the promissory estoppel theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the

representation." R.I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178 (Mass. 1995)

(quoting Pappas Indust. Parks, Inc. v. Psarros, 511 N.E.2d 621, 623 (Mass. App. Ct. 1987)).

Here, based on the undisputed factual record, the Court finds that Dr. Guldseth's reliance on

Dr. Bazylewicz's alleged promise was unreasonable as a matter of law. The clear conflict

between Dr. Bazylewicz's alleged promise to transfer his partnership interest to Dr. Guldseth and

the Employment Agreement's omission of any reference to partnership or the transfer of any

interest thereof "should have placed [Dr. Guldseth] on notice that he should not rely" on

Dr. Bazylewicz's statement. Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988).

> Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying. A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained. Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable. The law does not supply epistemological insurance. Nor does it countenance reliance on one of a pair of contradictories simply because it facilitates the achievement of one's goal.

Id. at 33–34. Further, given the fact that Dr. Guldseth went through other portions of the

Employment Agreement with a fine-tooth comb, proposing nuanced amended language and

seeking clarification regarding complex representations and warranties, it is highly unlikely that,

if he believed that he had been promised a partnership interest in FMA, he would not have raised

the fact that the Employment Agreement was silent on that point. In any event, regardless of

whether Dr. Guldseth's reliance on Dr. Bazylewicz's alleged promise was genuine, it was

unreasonable as a matter of law because a reasonable person in his position would have sought

assurances or clarification about a promise that he was relying on but that was not referenced in a

contract that included an unambiguous integration clause. See id. Accordingly, because

Dr. Guldseth has not demonstrated reasonable reliance, his claim for promissory estoppel fails.

See Celotex, 477 U.S. at 322 (noting that summary judgment is appropriate where party has

failed to adduce evidence of an essential element of his claim).

22

### G.     Count VI: Non-Payment of Wages

Dr. Guldseth premises his statutory wage claim on FMA's alleged failure to pay him all that he was due under the Employment Agreement.  [ECF No. 58 at 14, 20].  For the same reasons that Dr. Guldseth's breach of contract claim based on this purported underpayment fails, see supra, Section III.B.2, his statutory wage claim fails as well.  Put simply, it is Dr. Guldseth's burden to adduce evidence that he was underpaid, see Ellicott v. Am. Capital Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018) (noting that it is plaintiff's burden to show that the Wage Act was violated), and he has failed to do so.

### H.     Summary

To summarize, each of Dr. Guldseth's claims fails as a matter of law and the Court will therefore grant summary judgment in Defendants' favor.  Although Dr. Guldseth may have had a different set of expectations than did FMA, he is bound by the Employment Agreement.  On his other claims, the absence of evidence supporting his claims forecloses any recovery.

## IV.     Motion to Strike

Given that the Court has resolved Defendants' motion for summary judgment without needing to rely on the Affidavit of Karen J. Fraser and/or the exhibits thereto, [ECF No. 56-3], which are the subjects of Dr. Guldseth's motion to strike, [ECF No. 61], the Court denies Dr. Guldseth's motion as moot.

## V.     CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion for summary judgment, [ECF No. 54], is GRANTED, and Dr. Guldseth's motion to strike, [ECF No. 61], is DENIED as moot.

**SO ORDERED.**

February 22, 2021                                         /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE